## Maul *et ux. versus* Rider.

1. Whilst two were joint owners of the equitable title to a tract of land, taxes were assessed upon the whole; after partition, the whole tract was sold for these taxes, and the purchaser assigned his deed to one of the co-tenants. *Held,* that this was a redemption by that co-tenant of his own parcel, and necessarily of the parcel of his fellow, but vested in him no title to his fellow's part.

2. The co-tenant, after obtaining the tax-title by false representations, procured from his fellow the contract with their vendors, surrendered it to the vendors and obtained a deed from them to himself. *Held,* that he was a trustee *ex maleficio* of his fellow's part.

3. The 61st section of the Act of April 22d 1856, relating to the limitation of actions to enforce implied trusts, applied to this case.

4. A parol partition can be made of land held by equitable title.

ERROR to the Court of Common Pleas of *Jefferson county,* in which this was an ejectment by Frederick Maul and Mary E. Maul his wife, against John Rider and Philip Dietrich, for a "lot of land" in Winslow township.

The writ issued July 24th 1860.

The land had belonged to George Latimer, now deceased, and on the 22d of March 1837 his executors, by their agent, Gaskell, agreed to sell three hundred acres to John Rider and Martin Jacobs for $600, payable, $120 in hand, and the remainder in four equal annual payments. The hand-money, $120, was paid the same day, and various other sums afterwards, up to June 9th 1849, part by one, and part by the other, making the whole amount then paid $380. Jacobs died August 1st 1849, no deed having been made for the land. He left one child, Mary, the plaintiff, who arrived at age December 6th 1855, and was married in 1856 to the other plaintiff. There was evidence that upon payment of the purchase-money the purchasers were to have separate deeds, Rider for the west end, and Jacobs for the east end, and there was also evidence of a parol partition. A line was run by a surveyor in 1838; Rider taking possession of the west end by clearing, sowing grain and putting up buildings. Jacobs did some clearing also on the east end. Jacobs lived nearly all the time after the contract till his death, away from the land. The land was assessed as unseated in the name of Jacobs and Rider jointly until 1840 inclusive. In 1841 it was assessed one hundred and fifty acres in name of Jacobs, and one hundred and fifty acres in name of Rider; from that time to 1846 all in the name of Rider; in 1848 one hundred and fifty acres in the name of Rider, and from that time till 1854 *all* in the name of Rider; during most of the time half was returned as seated and half as unseated.

There was evidence that Jacobs furnished money to pay the taxes. Prior to December 14th 1840, the whole land was sold for taxes to John Philliber, and on that day a treasurer's deed

was made to him.   This he assigned to Rider, May 9th 1842, for
$15.40.   The article between Latimer and Rider and Jacobs was
held by Jacobs until some time after the treasurer's sale, and not
a great while before his death Rider called on Jacobs to get it,
that he might borrow money on the land, and Jacobs gave it to him.
After this Rider called several times on Gaskell to buy the land,
saying that *Jacobs' part* had been sold for taxes, and was lost to
Jacobs ; that he, Rider, had bought the title from Philliber.   The
original contract was finally given up to Gaskell, and a new one,
dated June 9th 1849, entered into with Rider alone, for the whole
three hundred acres, for $317.   A deed was made to Rider,
January 19th 1853, for two hundred acres, and a deed to Philip
Dietrich for one hundred acres, at the request of Rider.

The case was tried and resulted in a verdict for the plaintiffs
for an undivided half part of the land.   The judgment on that
verdict was reversed : see Rider *v.* Maul, 10 Wright 398.   On
the next trial, before Campbell, P. J., the verdict was for the
defendant.

The plaintiffs assigned for error that the court erred :—

1. In answer to the plaintiff's first point, in not charging, " that
to make a valid parol partition, it is necessary that the contract
be proved ; that the land was clearly designated ; that open, noto-
rious and exclusive possession was taken and maintained under
and in performance of the contract ; and that the improvements,
which constitute the consideration, were made on the faith of such
partition ; and, in the absence of these requisites, the alleged
parol partition would be within the Statutes of Frauds and Per-
juries, and would not avail the defendant in this action."   And,
leaving to the jury as a fact to be found by them, " that the
plaintiff's father and defendant, as early as 1837 or 1838, had a
division line run between them," when there was no evidence such
line was run prior to March or April 1838.   " Under all the evi-
dence in this case, the jury may find that the parol partition was
so far executed, that it would be against equity and good con-
science to treat it as a nullity.   We therefore instruct you, that
if you believe the evidence on part of defendant, the Statute of
Frauds and Perjuries is not a bar to defendants holding by virtue
of the parol partition."

2. In answering in the negative the plaintiffs' second point,
which is, " that the 6th section of the Act of 22d April 1856
does not apply to this case.   That this action is not brought to
enforce a trust arising out of a *contract* between Jacobs and
Rider, nor to enforce equity of redemption after re-entry made
for any condition broken ; nor to enforce any implied or resulting
trust *founded upon contract*, to which classes of cases alone that
section applies ; and that it will not, therefore, avail the defendant
anything."

[Maul v. Rider.]

3. In not charging in answer to plaintiff's fourth point, "that if Rider acted fraudulently a trust would arise by operation of law to Jacobs; and unless Jacobs had notice of such trust in his lifetime, or unless Mrs. Maul, his heir, had actual notice before the 5th of October 1856, at which time she was married, the statute would not bar her right, and so far as it is concerned the plaintiffs are entitled to recover." In charging, "*if* Rider undertook to act as the agent of Jacobs, and fraudulently procured the title in his own name, it would enure to the benefit of Jacobs, and Rider would be a trustee of Jacobs by reason of fraud; and in *that* case the Statute of Limitations would begin to run only from the discovery of the fraud." " Or where, by reasonable diligence, Jacobs might have discovered the same."

4. In not charging in answer to plaintiff's fifth point, "that to constitute an ouster, there must have been by the defendant some unequivocal, open act, entirely inconsistent with the right of his co-tenant; but there is no evidence of any such act before the 9th day of May 1842, and as this action was brought on the 24th of July 1860, even if the procurement by the defendant of the trustee's deed is to be regarded in the light of an ouster, and the defendant held exclusive and adverse possession until the time this action commenced, twenty-one years would not have elapsed, and the defendant would not acquire any title by the Statute of Limitations." In charging, "that if there was a parol partition made between Jacobs and Rider twenty-one years before the commencement of this suit, and the latter has since held the continued, adverse, notorious and exclusive possession of the west end of the tract, he would have a perfect title by the Statute of Limitations as to that. Was there any such executed parol partition, and was there such possession in defendant? The facts are for the jury:"—when there was no evidence of an ouster before the 9th of May 1842, and when the sufficiency of the evidence of a parol partition was for the court and not for the jury.

5. In not charging in answer to plaintiff's sixth point, "that if the jury believe from the evidence of the case, that the defendant worked on the land in 1839 and 1840, and that the land for three years was assessed as a whole in the name of Rider and Jacobs, and that with the knowledge or at the instance of Rider, and that Rider paid the taxes on such assessments, and that during that time Jacobs did not reside or work on the land, then Rider would be estopped from setting up any alleged parol division in March 1838; or at least it would be strong evidence, even though a partition line was run, that no actual partition had been made between the defendant and Jacobs; and charging, "that the doctrine of estoppel would not apply upon the facts alleged in this point. And the facts are for the jury."

6. In not charging in answer to the plaintiff's seventh point,

" that there is no evidence whatever in this case, though a division line was run, except that of Mr. Gaskell, who testified that separate deeds were to be made on the payment of each one's share, and that Jacob was to have the *west* end—that the parties *agreed* upon which part either was to have; and that, without some such agreement, the mere fact of Rider moving on and improving the west part in the absence of Jacob, who, if the testimony is believed, then lived in Allegheny county, and resided there till his death; and· in the absence of any evidence of his knowledge of the defendant's location, or improvements on the land, would constitute no .evidence of a 'partition of the land." In saying, " we leave all the facts in this case to you, to say whether there was a parol partition made between the parties at the time or not," when it was the duty of the court to charge that the facts were not sufficient to constitute a valid parol contract. " The jury must .be satisfied that there was an actual division made, that adverse exclusive possession was taken by *each* in pursuance thereof;" when there was no evidence that possession was taken by *either* in pursuance of any division line. " The absence of Jacobs would not affect the rights of Rider, *if* the division, followed by possession in pursuance thereof, was actually made."

7. In not charging in answer to the plaintiff's eighth point, " that at the time James Winslow ran the division line, the parties had not such an interest in the land as was susceptible of partition, and no such interest was acquired during the lifetime of Jacobs. There was, therefore, no valid partition made, and the plaintiffs are entitled to recover the undivided half of the land described in the writ." In charging, " if Jacobs and Rider had a contract with the attorney in fact of the owner, or if, in contemplation of a purchase, a survey was made, and the land divided between the purchasers, and the purchase was afterwards made in writing, and if the parties afterwards consummated the division by agreement, followed by possession in severalty, and made improvements, as we have stated, the partition might be good. How are the facts? They are for you."

*D. Barclay* and *P. W. Jenks*, for plaintiffs in error.—To take a parol contract of partition out of the Statute of Frauds, there must be *delivery* of possession pursuant to the contract: Pugh *v.* Good, 3 W. & S. 63. In Ebert *v.* Wood, 1 Binn. 216, Calhoun *v.* Hays, 8 W. & S. 132, and McMahon *v.* McMahon, 1 Harris 380, possession of their 'parts was taken by the parties *after* the partition. These cases embody the rule in Moore *v.* Small, 7 Harris 469, that possession must be taken and maintained in pursuance of the contract.

The evidence in this case did not bring it within this rule.

[Maul v. Rider.]

Parol contracts must be *express*, not *implied*, contracts, to take them out of the statute: Greenlee *v.* Greenlee, 10 Harris 235; Blakeslee *v.* Blakeslee, Id. 237. The court should have decided the question, not submitted it to the jury: Moore *v.* Small, *supra;* Workheiser *v.* Workheiser, 6 W. & S. 189.

The only part of the Act of April 22d 1856 that can possibly apply to this case, is the right "*to enforce any implied or resulting trust as to realty.*" A trust is an obligation arising out of confidence reposed in a person to apply property according to such confidence: 2 Bouv. Law Dict. 607. A trust is founded on a contract express or implied. Implied trusts are deducible from the nature of the transaction as matters of intent. Some are so by operation of law. If there is any here, it is of this kind.

The sixth section of the act refers exclusively to trusts arising from contracts express or implied. The fourth section provides for a conveyance by which a trust may arise by implication, construction of law, and such trust shall be of the same force as if the act had not passed. The fourth section, if either, applies to this case, for here the trust arises by implication. Rider was cotenant with Jacobs, and in procuring the title for the whole by fraud, he would be in no better situation than the vendors, and could set up no Statute of Limitations which they could not.

But if the sixth section operated, the trust would not arise till Rider obtained the legal title, January 19th 1853. Jacobs died before. Mrs. Maul did not reach age till December 5th 1855, and the suit was brought July 24th 1860. The statute would commence to run only from the discovery of the fraud: Pennock *v.* Freeman, 1 Watts 401. The act is not retroactive: Mullock *v.* Souder, 5 W. & S. 198; Martindale *v.* Warner, 7 Harris 471. The saving clause of Act of 1785, as to disability by minority, &c., was not repealed by Act of 1856: Miller *v.* Franciscus, 4 Wright 335.

The fourth point was pertinent, and should have had a definite answer: Geiger *v.* Welsh, 1 Rawle 349; Pennock *v.* Freeman, *supra.* The answer was hypothetical, leaving the jury to infer that if Rider did not act as Jacobs' agent, there was no fraud. There was no trust in Jacobs' life, and of course it should not have been put to the jury to say whether by reasonable diligence he could have discovered fraud. There was no pretence of ouster before May 9th 1842, and no fact on this point for the jury to find.

The facts alleged in sixth point were an estoppel; 1 Greenl. Ev. §§ 207, 208; McMahon *v.* McMahon, *supra.* There was no evidence to leave to the jury on the facts of the seventh point: Moore *v.* Small, *supra.* Partition cannot be had of a mere *equitable* interest in land.

[Maul *v.* Rider.]

*Jenks*, for defendant in error.—The questions now raised are under substantially. the same evidence as in the case of Rider *v.* Maul, 10 Wright 378, and were then decided adversely to the plaintiffs.

The opinion of the court was delivered, February 5th 1866, by STRONG, J.—That in 1837 the ancestor of the plaintiff had an equitable title to an undivided moiety of the three hundred acres, and that he and Rider were then tenants in common of the whole, are facts not in dispute. The allegation of the defendant is that a parol partition was made in 1838, by which he acquired title in severalty to one hundred and fifty acres of the west end of the tract, and that his co-tenant, Jacobs, became owner in severalty of the other one hundred and fifty acres, the east end. It is now contended there was no sufficient evidence of such parol partition to take the case out of the Statute of Frauds and Perjuries. It must be admitted the evidence was not very satisfactory, and perhaps, were the matter "*res nova*," we should be justified in holding that it should not have been submitted to the jury. But the case has been in the court heretofore, and upon substantially the same evidence. It was then held (10 Wright 378), that the testimony, if found by the jury to be true, was sufficient to establish an executed parol division of the land. We do not now feel at liberty to depart from what was then ruled, and hence we cannot say there was error in the answer given to the plaintiff's first and seventh points.

The state of the record is such that we cannot know whether the jury found there had been an executed parol partition. If there was such a partition, the right of the plaintiff to recover any portion of the west end of the tract was gone, and the subject of the controversy between the parties was reduced to the eastern one hundred and fifty acres. · How was the plaintiff's title to that in severalty divested ? This brings us to other important questions in the case. The defendant claims that the title to that part of the tract has also become vested in him, and he endeavours to sustain his right to it in three ways ; under the Statute of Limitations of March 26th 1785 ; under a tax sale of the whole three hundred acres made December 14th 1830, to John Philliber, and by him assigned to the defendant May 9th 1842 ; and under conveyances obtained by him from Latimers, the holders of the legal title in 1849 and 1853. We shall consider each of these.

The ejectment was commenced on the 24th of July 1860. If the defendant has a title to any part of the east end of the tract, the part which he alleges was set off in severalty to Jacobs in 1838, he must have had adverse, continued and exclusive possession of that part from July 24th 1839, down to the commencement

[Maul v. Rider.]

of this suit. But of any such possession by him of the eastern division there is no evidence whatever. That he held the western division, that which he claims was allotted to him, that he cultivated and improved it, was in evidence, and the court was therefore justified in saying that if there was a parol partition, twenty-one years before the commencement of the suit, between Jacobs and Rider, and the latter had since held the continued, adverse, notorious and exclusive possession of the west end of the tract, he would have a perfect title by the Statute of Limitations *as to that*. The fifth point of the plaintiffs assumed that there had been no partition. It asked no instruction for the case as it was, if the jury found that Jacobs had become an owner in severalty. And even if the tenancy in common continued, there was some evidence of ouster from the west end before 1839 found in the acts of Rider, evidence which could not have been withdrawn from the jury : Frederick *v.* Grey, 10 S. & R. 182. It was impossible, therefore, for the court to affirm the plaintiff's fifth point as it was presented. The court did not charge that the defendant was protected in the possession of the east end by the statute, nor did they leave to the jury to find that he was thus protected, and clearly he was not.

Passing now to the second ground of defence, and assuming still that the jury found a parol partition executed, we have to consider the effect of the tax sale. It was a sale of the whole three hundred acres assessed to Rider and Jacobs in 1838. Probably the assessment was made in the fall of 1837, while they were confessedly tenants in common. The sale was made December 14th 1840, to John Philliber, who, on the 9th May 1842 assigned his deed to Rider for the consideration of $15.40. Had Rider and Jacobs continued tenants in common, this transaction could be called nothing more than a redemption. Rider could have obtained by it no advantage over his co-tenant. It would not even have converted him into a trustee for his co-tenant. The outstanding right was called in within the period allowed for redemption. But if when the land was sold the parties had become one the owner of the east end in severalty, and the other the sole owner of the west end, the effect of the transaction might be different, and it clearly would be, if the taxes for which the land was sold had been assessed after the tenancy in common had ceased. There would then have been nothing to prevent either of the parties from buying the land of the other, exclusively for his own use. This case differs, however, from the one supposed. The taxes were assessed while Rider and Jacobs were joint owners. They were a burden upon the whole three hundred acres. It was as much Rider's duty and interest to pay them as it was the duty and interest of Jacobs. And when the land was sold, recovering the title was essential to the preservation of Rider's

[Maul *v.* Rider.]

interest. It was a redemption of his own land then held in severalty.— I do not think it can be regarded as anything more, certainly not an acquisition of the title to'the east end of the property —not even the acquisition of a trust for Jacobs. It was simple redemption of his own parcel; and consequently of the parcel of Jacobs. There is nothing then in the tax sale to divest the title of the plaintiff to the east end, if it be assumed that partition was made.

It follows that if the defendant has any protection against the claim of the plaintiffs, it must be found in the conveyances he obtained from the Latimers. The evidence in relation to these was that the original article of agreement between Rider and Jacobs and Gaskell, the agent of the Latimers, was for some years in the possession of Jacobs. He died in 1849. Not long before his death Rider obtained possession of the article, by the pretence that he wanted to borrow money, and wanted the papers to give the land for security. Having obtained them, he went to Gaskell, told him that Jacobs's part had been sold for taxes, that the time of redemption had expired, that the land was lost to Jacobs, and that he (Rider) had bought the land from the purchaser at tax sale. Mr. Gaskell was induced to give a new article in lieu of the first, by which the Latimers agreed to sell the whole three hundred acres to Rider alone, for a sum which appears to be about what remained unpaid of the purchase-money mentioned in the first article. This new agreement was dated on the 9th of June 1849. Prior to that time Jacobs lived near Pittsburgh, and he continued to live there until he died. On the 19th of January 1853, Rider obtained a deed from the Latimers, for himself, for two hundred acres, and at his request a deed was made to a man named Dietrich for the other hundred acres. If these facts were believed by the jury, and there was abundant evidence of them, a gross fraud was perpetrated by Rider in obtaining the legal title to himself. His representations to Jacobs were false, and his assertions to Gaskell. He obtained the first article by covin, and was thus enabled to deliver it up, and procure another. Undoubtedly he became a trustee for Jacobs, or the heir of Jacobs, of that part of the east end of the tract for which he obtained title from the Latimers. Holding thus the title to that parcel as a trustee *ex maleficio*, he must surrender the possession unless he is protected by the sixth section of the Act of Assembly of the 22d of April 1856. That section limits to five years the time within which an action may be brought to enforce any implied or resulting trust as to realty. But there is a proviso that as to any one affected with a trust by reason of his fraud, the said limitation shall begin to run only from the discovery thereof, or when by reasonable diligence the party defrauded might have discovered the same. In reference to the

[Maul v. Rider.]

effect of this statute upon the case, the plaintiff's fourth point and the answer thereto were all-important. The point was, "that if Rider acted fraudulently, a trust would arise by operation of law to Jacobs, and unless Jacobs had notice of such trust in his lifetime, or, unless Mrs. Maul, his heir, had actual notice before the 5th of October 1856, at which time she was married, the statute would not bar her rights; and, so far as it is concerned, the plaintiffs are entitled to recover." To this the court answered, " If Rider undertook to act as the agent of Jacobs, and fraudulently procured the title in his own name, it would enure to the benefit of Jacobs, and Rider would be a trustee of Jacobs by reason of fraud; and in that case the Statute of Limitations would begin to run only from the discovery of the fraud, or when by reasonable diligence Jacobs might have discovered the same." It may be said of both the point and the answer that they are not strictly accurate. The point treats notice by Jacobs in his lifetime, or actual notice to Mrs. Maul, his daughter, before her marriage, as alone sufficient to bar the action under the statute; but the proviso to the sixth section regards the person defrauded as affected by the limitation, though he has no notice of the fraud, when by reasonable diligence he might have discovered it. And the answer is obnoxious to two objections. The first is that it was qualified by the element of a supposed agency by Rider for Jacobs. The court affirmed that fraud in procuring the title in his own name would raise a trust in Rider for Jacobs *if Rider undertook to act as Jacobs's agent.* And so it would have done without any such undertaking. Yet the language of the judge was fitted to lead the jury to the belief that an attempted agency was a necessary constituent to the implication of a trust. A more serious objection to the answer is, that, even if abstractly correct, it was inapplicable to the case. The legal title to the land was not acquired from the Latimers until January 19th 1853. Of course there could have been no trust of that before that time. But Jacobs died in 1849. He never, therefore, had any knowledge of the fraudulent acquisition, or any means of knowledge. When he died, his daughter the plaintiff was a minor, and she did not attain her majority until December 5th 1855, within five years from the time when this action was brought. I find no evidence that she ever knew of the fraudulent acquisition of the title before she came of age, or before this suit was brought, or evidence that reasonable diligence would have revealed the fraud to her. It is true the court was not asked to charge that there was no such evidence, and here is the difficulty. Had they been so asked, they could not have refused the request; but we cannot reverse the judgment merely because the court neglected to give instruction which they were not asked to give, and especially when, as in this case, their attention was with-

1 P. F. Smith—25

[Maul *v.* Rider.]

drawn from the fact that evidence was wanting by the form of the point presented. Yet it is manifest that the decision of the case may have turned upon the answer given to this point; and we cannot shut our eyes to the fact that the plaintiff may have been defeated solely because the jury may have found she had notice of the fraud, or might have discovered it by reasonable diligence without any evidence to warrant such a finding. We think therefore the case ought to go back for another trial, not for this reason, but because the jury may have understood from the answer that there was no such fraud as raised a trust, unless Rider undertook to act as agent of Jacobs.

If it be said that a trust arose in 1849, when the defendant gave up the first article and took a new one between Gaskell and himself alone, the same considerations are applicable. There is no evidence that Jacobs ever knew of such a substitution. He died in that year, whether before or after the fraudulent procurement of the second article does not appear, and there is no evidence to bring home to his minor child knowledge of the fraud, or want of reasonable diligence in discovering it.

We have thus far considered the case as if the jury had found the alleged parol partition proved, and as if the only contest was respecting the east end of the whole tract, the parcel allotted to Jacobs in the division. If there was no parol partition, the defendant cannot protect himself against a recovery of an undivided moiety by any other means than the Statute of Limitations of 1785, or the limitation prescribed to the assertion of trusts by the Act of 1856, unless the jury should believe there was no fraud to raise a trust, which is hardly possible. The Act of 1785 will protect him in the possession of all which he took into his actual and exclusive possession, after having ousted his co-tenant, and which he held adversely and continuously twenty-one years before the suit was brought, and it will protect him no farther. And the Act of 1856 will protect his possession of the remainder only in case the owner defrauded in the procurement of the title had notice of the fraud five years before this suit was brought, or might have discovered it with reasonable diligence.

We discover nothing else in the record that requires notice, unless it be the fifth point, which was answered correctly, and the answer to the eighth point, to which no just exception can be taken. A parol partition of lands held in common by an equitable title can be made.

Judgment reversed, and a *venire de novo* awarded.